All right. Counsel, you may proceed. May it please the Court. Good morning, Your Honors. Lee Handelman Smoller on behalf of Lee Plaintiff's Appellants. I would like to reserve four minutes for rebuttal, please. Plaintiff's appeal of the District Court's decision granting the defendant's motion to dismiss the second amended complaint is presented under a de novo standard of review. The facts alleged in the second amended complaint, which I'll refer to throughout as the SAC, comply with all of the elements of securities fraud pursuant to both the PSLRA and the federal rules. The two issues on appeal are scienter and loss causation. And if it's okay with Your Honors, I would like to take loss causation first. The plaintiffs have properly pled loss causation pursuant to the Supreme Court and Ninth Circuit standards. The standard, which has been clearly enunciated time and time again, and recently in the Ninth Circuit 2016 case of Lloyd v. CBB, where the Court quotes the Supreme Court in Halliburton, stating the burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures, which caused the company's stock price to drop and investors to lose money. In this case, the plaintiffs have clearly complied with the pleading standard. The January 15, 2015, disclosure of Calavo's pervasive gap violations, which led to a restatement and wiped out the company's profits, unquestionably was a corrective disclosure. There's no dispute there. The SAC alleges that the disclosure directly undermined defendant's statements about net income and the state of the company's financials. Further, the SAC alleges that upon this disclosure, analysts attributed the stock decline of Calavo's accounting machinations substantially to the market's knowledge of Calavo's accounting treatment for the contingent consideration, which is the fraud alleged in this case, how the defendants booked that contingent consideration. That is all the Ninth Circuit and the Supreme Court requires. The district court here committed reversible error by requiring plaintiffs to isolate what portion of the stock drop at the pleading stage was due to the alleged fraud and what portion may have been due to, as defendants state, missed earnings. And the district court doesn't cite any authority for that, but in its ruling, it basically compared the plausibility of defendant's reason for the stock price, missed earnings, and plaintiff's reason for the stock price, which was the disclosure of the fraud, which the defendants don't dispute. They did disclose that there was a restatement due to the accounting error. Well, I think you're saying that the loss, the drop in the price, could be due to two different purposes. It could be due to the restatement, and at the same time, it could be due to the fact that the profits were reported to be less than what was hoped for. And those are each equally plausible inferences that can be drawn. I think that's what the rationale was. What do you say about that? That was the district court's rationale, but that's not what the Ninth Circuit requires. The Ninth Circuit is very clear that in pleading loss causation, a plaintiff is not required to show that the misrepresentation was the sole reason for the investment's decline in value. In other words, that's a fact question. And time and time again, Ninth Circuit courts have held that. And especially in this case, the district court based its decision on an analyst report that was proffered by defendants and not referred to in the complaint anywhere at all. So here the plaintiffs have an analyst saying the stock price decline was due to the market's evaluation of what went on with the contingent consideration. And then the defendants proffer their own analyst that wasn't referred to at all, and the district court takes these competing analyst reports that could be one could be correct, the other could be correct. How do you ever determine which one is correct? I'm a little bit puzzled by that. Two events happen simultaneously to produce one result. That's for an expert. That is exactly what plaintiffs and defendants in securities cases do. Later on, after discovery, the plaintiffs will retain a damage expert and the defendants will retain a damage expert. So you're saying it's a matter of law that from a pleading perspective that's sufficient if there are multiple causes that doesn't defeat your pleading. That's exactly correct. That's Ninth Circuit law. That is Ninth Circuit law. Correct. Okay. Go ahead. I was going to suggest you move on to your other issue because you've used over half the time on this. I'd be happy to, unless you have a question. Well, no, I just same thing. I thought we were going to talk about Cyanter. I'm going to talk about Cyanter. I'll talk about it right now, Your Honors. The Second Amended Complaint alleges Cyanter in a holistic way with one indicia of Cyanter giving context to the next, which the district court disregarded. The plaintiff alleges an obvious gap violation, which caused profits to be overstated by 2,000%. At the same time, the production of California avocados had declined 50%. The complaint also alleges that the contingent consideration, the accounting for the contingent consideration here at issue was a significant accounting element for which the CFO, Defendant Bruno, would have been made aware and that both the motives give context to the overall picture. I'm going to go into each one individually. First one, we talk about the obviousness of the error. The defendants claim this was an arcane accounting rule of sorts, but here you have a $100 million deal by the company, a huge deal where they knew that if they hit certain targets, they would end up having to pay $86 million over the next five years. And the complaint alleges that for these types of deals, the gap provision was simple and clear and obvious. The big four accounting firms and the literature and the gap provision state that the majority of these transactions are booked in equity. There's no dispute there. Why did Ernst and Young say this was okay? So obvious. Why did they say it's okay? Well, for the period in question, Ernst didn't say anything because Ernst didn't. Well, but there was a couple of years when they were saying that this was okay. Correct. And that is entirely a fact question. We don't know what happened behind the scenes. Was Ernst negligent? Was Ernst telling the company you need to do this and the company didn't do it? Was Ernst doing an audit in compliance with GAS? These are all factual questions that can't be resolved at this stage of the litigation. All we know at this stage is that immediately upon the new partner coming on at Ernst, they were forced to restate. Why did that new partner come on? Maybe they recognized that the old partners were doing things. These are questions that we can't answer, but we do. Doesn't it bear upon the issue of obviousness, and you can accept that audit report and take judicial notice of that? I'm sorry, Your Honor. Doesn't it bear Ernst and Young's determinations, bear upon the issue of whether this was obvious or complex? No, because it was obvious to the Ernst partner that came on and immediately forced the company to disclose. And the case law is clear in this circuit. You have the New Mexico – you have the – let me get there. All the case law in the Ninth Circuit is clear that a, quote, but let's suppose we're looking at the prior years. A clean audit does not negate scienter at this stage of the litigation. And you've got the only law that the district court cited to support their position was the In re Diamonds case, which the district court didn't – took one half of a sentence, and I'd like to read – because this is exactly what Your Honors are asking, and this is the law in the circuit. If I could read the passage that actually is in the case. The Diamonds district court stated, a clean audit opinion may possibly support the conclusion that defendants did not act with scienter, and that's where the district court stopped. But the case goes on. Comma, but it is not dispositive. In order to know how much reasonable reliance should be accorded the audit opinion, we will eventually have to evaluate what communications passed between the company and the auditor, as well as what, if anything, was hidden from the auditor. Senior management at Diamond had an independent duty to ensure compliance with GAP and maintain effective internal controls. This duty cannot be delegated to Deloitte, who was the auditor in that case. Deloitte's unqualified audit opinion does not negate an inference of scienter. And I have the brief cite several district courts in the Ninth Circuit that follow this. It is the law in the circuit, and neither the defendants or the district court have cited any authority to the opposite. At this stage of the litigation, that is a factual question and should be left for summary judgment on the trial fact. Do you have to or have you plausibly alleged knowledge of falsity or? Well, yeah, knowledge of falsity. So that was another error by the district court, that the defendants, that plaintiffs must plead that the defendants actually had knowledge or believed that the accounting treatment was erroneous. But that, too, isn't the law because scienter can be alleged by extreme recklessness. And when you look at the allegations as a whole, you have the obviousness of the GAP violation. You have the magnitude of the fraud, a 2,000 percent overstatement. You have the fact that this was a significant accounting element for the company. You have the motives, which we haven't even gotten to, but two motives, both of which support scienter in this case, especially where you have analysts focus on the issue of the declining production of avocados. In fact, in the third quarter of 2014, when the false financials were issued, the defendants, only because of the accounting fraud, were able to report positive earnings. And had they had accounted for the earn out in the right way, they would not have met analyst consensus. They're not hiding the nature of the transaction. I mean, there are filings that say what they are doing with the contingent liability. Does that negate their... I would disagree that they're not hiding. They have disclosed the terms of the deal over and over again. But the financial statements were very unclear as to how they booked that transaction. And from an individual investor's point of view, they're not required to go out and get an accounting expert to go back and look at the terms of the deal. How was it unclear? I mean, it seems clear enough to me what they did. Tell me how it was unclear. It was unclear because when you look at the financial statements, for instance, the earn out contingent consideration required $55 million that would ultimately, if they hit their triggers, would be booked in cash and $19 million in equity. And when you look at how they booked it, there was a line item that said $1.5 million in cash and $7.4 million in cash. And then they had different headings. One said contingent consideration. One said RFG. And from an investor's standpoint, they're not required. They're laymen, right? You have an individual investor relying on analysts, relying on the market, relying on the price of the stock to say, you know what, I'm going to go out and buy this stock and put money away for my retirement. And then they're not required to go out and hire an expert to look at the financials, and you have analysts that were closely following this stock that they, too, didn't understand what was going on because when the truth came out and the company was required to restate, an analyst said, oh, the stock dropped, and part of the reason the stock dropped is because the market was unaware of how they booked the contingent consideration. The stock rebounded about three months later, yes, but that also doesn't negate loss causation. And, again, there's no authority for that. That's an issue of damages. And I think that the district court and the defendants were conflating whether plaintiffs have properly pled loss causation and what the damages ultimately will be. You've used up the entire time, so we'll give you three minutes. Thank you, Your Honors. Good morning, Your Honors. And may it please the Court, I'm David Schwartz, and I'm here on behalf of Colavo and the individual defendants. Colavo is a company that's located about 80 miles up the road in Santa Rosa, and it's been there in different forms for close to a century. And it grows avocados, and it ships them, and it also imports them. So a substantial number of the avocados come not only from our state but from Chile and Peru. The other thing that the company does and has done over the last several years is diversify its business, and that's the transaction it issued. In June of 2011, it entered into an acquisition of a company called Renaissance Food Group. Renaissance Food Group does a variety of packaged fresh foods. The structure of the deal was in and out, and it was done in that way so that there could be downside protection in the event that RFG didn't hit the milestones. And there were two milestones. The first was to meet an EBITDA number within a five-year period. And the second metric would be with respect to revenues. There were two milestones. There was an initial payment. Part of that was in cash that was booked as a liability. The balance, which was $23 million, was booked in the form of shareholder equity and was recorded accordingly in that line item on the shareholder side of the financials. The second thing that happened during the three-and-a-half years preceding this restatement was that the company, RFG, met its milestones and exceeded its milestones. And pursuant to the milestones, it got or was entitled to the full measure of the earn-out. An amendment occurred in 2013 to the agreement that allowed RFG to take what would have been cash, which would have been an expense to the bottom line of the company, and instead be paid in equity. The stock price had been moving. So it was $23. As of June of 2011, it moved up to $29 as of the first milestone when the sellers elected to take what was cash in equity. And then the third milestone was also converted. That cash liability part was converted into in-kind payment in equity at a current share price of roughly $45.50. That brings us to the restatement. There was, as counsel indicates, no change in the auditing firm. It was a change between the two auditing partners. Apparently what the – and as the Court acknowledged, there were three clean financials issued, which as the Court found, and I think to be clear here, Judge Wu did not say that it negates scienter. He says it strongly counsels against a finding of scienter. And so that is, in fact, the law of this circuit. The restatement was a one-time historical non-cash event. It's respectfully incorrect to characterize this as an event that, quote-unquote, wipes out profits. So now we're at a point where we are facing an allegation, and the first complaint is filed. E&Y is named as a defendant, and it is alleged to have been knowingly and intentionally engaged in a fraudulent conspiracy. The complaint is dismissed by Judge Wu on two separate grounds, scienter and loss causation. And the Court went directly to the three arguments that were made in the first complaint, in the amended complaint, and here today. Number one, the Court concluded correctly that a restatement alone is insufficient. Scienter requires more than a misapplication of an accounting policy. Two, failing to see the obvious does not constitute fraud. Three, there is no dispute, and counsel acknowledged it before Judge Wu, and again here today, that the facts of the transaction were disclosed. The terms of the merger were accurately reported. The accounting judgments as to how the classification would occur were set forth on the financial statements that the market was able to see these, and sophisticated investors, institutional investors, the folks who read for a living balance sheets, and including the analysts who commented on the restatement also could look at this. So it is a bit of a, more than a conflict to characterize this as so blatant and obvious an error. At the same time, to suggest that, as the Court indicated, if it was so blatant and obvious, why didn't EY see it? The answer we just heard is, well, we'll have to do some discovery to find out why that wasn't. We're at the pleading stage, the requirement for the who, what, when, and where to be alleged so that we can find some red flags or indicia of fraud, and nothing has been alleged here to suggest that. So we are left with a third of the three arguments the plaintiffs have made, in addition to obviousness and the fact of the restatement. That's magnitude. The number is not alone sufficient to establish a strong inference of scienter that, and that's the Court's most recent conclusion in the Dearborn case that was issued a few months ago. In fact, it makes sense, because if one were to look at magnitude as the sole or primary or even a particularly relevant indication of scienter, then one could then fall into the trap of fraud by hindsight. People make big-dollar mistakes in good faith. They make big-dollar accounting misjudgments negligently. They make them, as some cases have seen, with regard to reckless disregard or with intent to defraud. None of that has been alleged. So the inference falls decisively against finding scienter based on the obviousness, and the fact that it passed review by professional auditors, and the fact that one might have had one opinion and the other came to a different conclusion, only further underscores that point. So does the fact that the error, if it was so blatant and obvious and so clear to the accounting that came in, the partner that came in, you have to look at the fact that there was a consistent disclosure, an open and notorious way of the judgments that led to this restatement. The fact that the open and blatant and obvious error was open and notorious and repeated in quarter after quarter filings and referred to and discussed in the year-end annual reports and in the certified financials as reviewed by the accountants, cuts again against the notion that this was indicia of misrepresentation. Claims actually end up contradicting their own allegations of obviousness in a couple of ways. Number one, they cite to, and this is at the excerpt of record, ER 233 to 34, Grant Thornton report, and they are relying on it, yet Grant Thornton indicates that the guidelines for classifying the contingent consideration is complex and difficult to analyze. And interestingly, the second shot at the, actually the third amendment, this was the second amendment complaint, now includes 15 pages of testimony, if you will, by an expert who is saying in a pleading that he believes that this was blatant and obvious. It took 15 pages to make that explanation. The explanation covered, by my count, no less than nine different accounting rules or guidelines to be applied. Just give me a little bit of a thumbnail sketch as to why this was not blatant and obvious. Well, number one, that you have three clean audits. Number two, you have no evidence as pled that there were any indication as given to the auditors or internal controls or anything that there were warning signs or an internal discussion about concerns. Number three, you have the admitted fact that there was a change in auditor and a change in opinion. If, as this is alleged, it is so obvious, then it would have been obvious to the sophisticated and institutional investors and the analysts who covered the market. And that gets to one of the related points that was mentioned, the analyst report that was issued on the day of the, or day after the restatement and the announcement of the restatement and the earnings. What this analyst said is that it is not, in his words, material. And so when you have the BBD analyst making a comment about the lack, in his view, of materiality of the restatement, you have exactly the point that was identified in Metzler. You've got a number of things that are going on at once, and you have the analyst looking at it from the perspective of the street and saying to the investors, we don't regard the fact of the historic restatement as being material. When, after the transaction, when it was first inserted, were both the cash and the stock payments carried as equity? No, Your Honor. Only the stock? Yes, Your Honor. The cash was carried as liability from the outset. It was booked accordingly. And the stock consideration was booked under the shareholder equity law in the financials. I just want to make, just to be clear, one point on this analyst. This analyst is the same analyst that was identified in the plaintiff's plea. They pointed to his report in September, and now they ask the Court not to look at his report in January. So nor do they call to the Court's attention their own analyst's report on the 20th of January. But your adversary says that that's left for a trial, those are factual matters, and it has nothing to do with the pleading requirements. Well, so let me talk about why the loss causation standard is not merely defined by whether or not you can point to a disclosure and a drop. The Court has said repeatedly, not that it must be shown at the pleading stage that it is a sole reason, but it is a substantial cause. And so it is left to the Court at the pleading stage to look at all inferences that may lead to the conclusion that there was causation. Do you disagree with your adversary's statement that it's sufficient for pleading purposes just to plead that there was a drop at the time of the restatement? I do, Your Honor, and I do because that's what Metzler has said, and that's what other courts have said when they've looked at it. So you believe that the fact that the earnings were reported at the same time as the restatement somewhat muddies the water and, therefore, that makes the pleading deficient? I believe that it makes the pleading deficient, and I also believe that the Court was entitled to in looking at what constitutes a substantial cause. Did you make that decision to report the earnings at the same time as the restatement? That was a decision that you had within your control? You created this confusion. I can say that the accountants have, forgive me, Your Honor, under the disclosure requirements and the timing requirements with respect to when these announcements are made, there are timeframes where it has to be done and it should be done, as long as it's done within the requisite timeframe once the decision has been made in consultation with the auditor. So there's no suggestion at all, at all in this record, that somehow there was a linkage between the earnings announcement, which had been scheduled, and the decision to make. It just strikes me as a curiosity that it happened at the same time, and that aids your argument. And, as I said, we can only play with the facts that have been dealt to us, and this is not an allegation or an inference that was drawn. On the other hand, the Court correctly was entitled to make the competing balances under the Rule 9b standard, which is the rule to apply to the analysis of loss causation. There's a couple other points with respect to the lack of evidence. This is the burden at the pleading stage, or substantive allegations. A little over a minute. Yes, Your Honor. There's nothing that suggests that there are red flags. There's nothing that suggests that there were events that were brought to the attention. In fact, one of the most interesting and important admissions by the plaintiffs is what they said at paragraph 137. Their allegation is that the plaintiffs alleged that Calavo's accounting group met monthly to review the accounting records and to ensure their accuracy at paragraph 137. So that certainly cuts against the idea that they were internally trying to avoid finding out the correctness. And so, at the end of the day, we don't have an allegation that EY questioned the accounting treatment. Instead, we have first a complaint that sues EY for fraud and then takes that charge away and then impliedly conceives that EY, having been dismissed, made a mistake, just as one would, as the court found, so too did Calavo. Instead, during the oral argument before Judge Wu, the plaintiffs now took the position that Calavo, quote, pulled the wool over EY by doing something which misled EY into perhaps perceiving the transaction incorrectly. Well, whether that's a binding admission or not, it certainly is completely at odds with the requirement not only to allege with particularity for who, what, when, and where. But the problem of the allegations that somehow a transaction that was formulated in 2011 is now the basis to conclude that events that occurred three years ago, based on the identical accounting judgments that hadn't changed, somehow constitutes fraud. Just as the suggestion that the idea that drought might have been anticipated as a reason for doing this accounting, that is a hard one to swallow, given that Calavo not only regularly disclosed avocado sales, but that it was seeing increases in the volume of avocados it was buying from the state of California. There's nothing in the speculative nature that somehow the defendants could have conceived of a scheme and left it in a locker room in a bus depot for three years waiting for an event to occur when, in fact, this company didn't know whether RFT would be a success or not. I appreciate your allowing me the latitude, and thank you, also, on that basis, Your Honors. Thank you, counsel. I'd like to hit one quick point on loss causation, and then I'll move on to the Syantar argument. I urge Your Honors to look at the case law, because there is just no authority that at the pleading stage plaintiffs have to isolate what portion of the drop is caused by the fraud. There is no dispute here that the fraud was disclosed. And in the Metzler case, that was the issue, and that is the only case cited to by defendants and by the judge in the lower court. It's just a misstatement of the law. And if what defendants are saying they would like the law to be is true, then any company on any given day can disclose mis-earnings when they decide they're going to disclose their fraud, and they will always escape liability for securities fraud. But he said that they had no option in that respect. Who says that? Maybe that's a factual question later, but that is not the law in this circuit. I would like to move on now to Syantar and just state a quick few points. Number one, with respect to this issue that defendants disclosed this for three years and the whole market knew about it, that's just not the truth. The court, in fact, the district court in this case has already rejected that argument in finding what they're essentially making is a materiality argument, that this was all disclosed so none of this really matters anyway. And that's not the truth. The court said investors are entitled to rely on SEC filings, and whereas here plaintiffs adequately alleged that they were materially misled, the court would not reject their claim on the fact-specific grounds that a sufficient disclosure was made, and that's at A359. So that's not an issue in this case. They didn't record the cash as a liability, as defendants have stated. They only recorded $1.5 million in cash. Nobody knows where that number came from or why they recorded that amount. And this wasn't a judgment. GAAP requires this to be booked a certain way. This was not a judgment call, and, in fact, if it was, they wouldn't have restated. ASC 250, the accounting rules, state that restatements emanate from material errors based on information available and known at the time the original financial statements were issued. This is not a judgment call, as defendants are calling us. This was a material error. Defendants have still to this date not come forward and said why they booked it wrong. The obviousness is by the fact that when you look at the GAAP provisions, and it's so stringent to book this in equity, and the reason why it's so stringent is because they don't want companies avoiding a liability on the bottom line. And the majority of these transactions are booked. The defendants had to go out of their way to book it as a liability, and you're telling me that the CFO of a public company wouldn't have known or wouldn't have discussed that the GAAP provisions usually provide that you do it this way. But, no, we're going to go out of our way, and we're going to book it in a way that affects our financials in a positive way. And the fact that this went on for three years, who knows what was going on behind the scenes with Ernst, but the fact of the matter is they brought in a new audit partner, and that audit partner immediately forced the company to disclose a restatement, which was material error. And so it is obvious, and there's no case law cited by the court that says something to the opposite. Defendants' argument belies the whole purpose of GAAP and the securities laws, and that's to present the financial statements fairly and accurately to investors. Net income is what investors look to to determine profitability of a company and whether or not they want to invest or sell in a stock. This net income was overstated by 2,000%. And, in fact, in the period for which the financials were misstated, the defendants had reported a $16 million profit, which was the exact number the defendants needed to hit their bonus. So when you look at this holistically, you're not looking at it, okay, so this is what the district court did. We look at it and we say this wasn't obvious. Put that aside. I don't believe in the magnitude. Even though the Ninth Circuit finds magnitude, it presents indicia of scienta. The district court instead pulled two cases from out of this circuit to rule otherwise. And then they said, okay, there's no magnitude. And then what the district court says in their opinion is, now we move on to motive. No, that's not how we're supposed to look at this case pursuant to teleps. We're supposed to look at this case holistically, that you have an obvious gap violation with a 2,000% overstatement, and that overstatement led to the defendants being able to achieve a bonus. And altogether, this case unquestionably presents indicia of scienter. Thank you, counsel. Thank you, Your Honors, for your consideration.
judges: Canby, Reinhardt, Block